[No. 33120. *En Banc.* November 17, 1955.]

FIELD ENTERPRISES, INC., *Respondent,* v. THE STATE OF
WASHINGTON, *Appellant.*[1]

*The Attorney General* and *Keith Grim, Assistant,* for appellant.

*Evans, McLaren, Lane, Powell & Beeks* and *Martin P. Detels, Jr.,* for respondent.

WEAVER, J.—Plaintiff, a Delaware corporation with its principal place of business in Chicago, Illinois, maintains this action to recover $4,089.35 business and occupation taxes paid by it, under protest, to the state of Washington. The taxpayer's return covered the period from August 1, 1950, through April 30, 1953, and reported retail sales in the state of Washington, during this period, of $1,593,276.40, all of which sales were made as hereinafter set forth.

The tax was levied pursuant to RCW 82.04.220, which provides:

"There is levied and shall be collected from every person a tax for the act or privilege of engaging in business activities. Such tax shall be measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be."

[1]Reported in 289 P. (2d) 1010.

In computing the tax, the statute provides that there may be deducted from the measure of tax

"(6) Amounts derived from business which the state is prohibited from taxing under the Constitution of this state or the Constitution or laws of the United States." RCW 82-.04.430.

The trial court held the imposition of this tax violated the commerce clause (Art. I, § 8 (3)) of the United States constitution. It entered judgment against the defendant for the amount of the taxes paid with interest from the date of payment, together with statutory costs. Defendant appeals.

The taxpayer publishes two sets of books, the *World Book Encyclopedia* and *Childcraft*. It maintains division offices throughout the United States, each of which supervises its activities within defined geographic areas. Its activities in Alaska, Idaho, Oregon, and Washington are carried on through a department or division known as the Educational Division, with offices in Seattle. This division is, in turn, divided into eight separate districts, three of which are located in this state.

The Seattle division office consists of a suite used by its division manager, the Seattle district manager, and four employees of the taxpayer who do bookkeeping and stenographic work. The lease is in the name of the division manager; he pays the rent and utilities from his own funds. Each main entrance door bears only the taxpayer's name as publisher of the books mentioned. The office contains an instruction room of sufficient size to accommodate twenty-five to thirty persons. It is used for new solicitors' instruction classes, salesmen's promotional meetings, and displaying advertising material relative to taxpayer's publications. The office furniture and machines are furnished and owned by the taxpayer, which makes replacements and repairs and pays personal property taxes.

At approximately biweekly intervals, the Seattle division office sends out two separate instructional and promotional newsletters to the salesmen.

All advertising is handled by the taxpayer's Chicago office through a national advertising agency. However, the division or district managers frequently exhibit the books at teachers' institutes and other similar conferences. Five or six sets of the books are in teacher-training schools in the state, replacements being made directly by the Chicago office. At irregular intervals, sets of books are displayed in two department stores in the state. A salesman attends the display, answers inquiries, and takes orders on the taxpayer's usual forms. On one occasion, the division manager arranged to give the encyclopedia as a prize to the team of school children winning a quiz-contest program, broadcast weekly by a Seattle radio station.

Salesmen are employed by either the division or district managers. They are frequently employed through want ads in local newspapers, but are usually employed by direct contact or through local school and educational channels. There are approximately four hundred and ten salesmen working under the supervision of the Seattle office. Approximately one hundred and seventy-five of them are residents of the state of Washington; thirty work full time.

Orders for approximately ten sets of books per year are taken directly at the Seattle office, but only when a prospective customer happens to call at the office. The employees of that office do not solicit orders.

Orders for books are obtained through personal calls by salesmen. When a prospective purchaser indicates a desire to purchase, an appropriate order form is filled out by the salesman and signed by the prospective purchaser. The form states, "This non-cancellable order is subject to acceptance in Chicago."

The down payment or payment in full is collected at the time the order is signed. The order and payment are delivered to the Seattle office.

Data of an undisclosed nature is abstracted, compiled, and retained by the Seattle office. The order and remittances are forwarded to the Chicago office. On occasions, the Chicago office may request either the Seattle office or a particular salesman to secure a credit investigation. This is

made by outside agencies and transmitted to Chicago for analysis and decision. If an order is not accepted, the down payment is returned to the purchaser by the Chicago office.

All stocks of books, except display and sample sets, are maintained outside the state of Washington. Shipment, pursuant to order or contract, is made directly therefrom to the customer, f. o. b. the point of shipment. Transportation charges are prepaid and billed to the customer as provided in the order. All payments, except the initial payment, are made by the purchaser directly to the taxpayer's Chicago office. Inquiries concerning the return of books or replacements are referred to the Chicago office. The Seattle office does not repossess or repair books.

All earnings of the manager and salesmen are computed on a commission basis. The commission payable to the division manager is computed to include reimbursement for office expenses paid with his personal funds.

We have set forth the agreed facts of this case at some length, because it is our considered opinion that the answer to the question raised is to be found in the recent unanimous *En Banc* decision of this court in *B. F. Goodrich Co. v. State,* 38 Wn. (2d) 663, 664, 231 P. (2d) 325, cert. den. 342 U. S. 876 (1951).

The facts of the *Goodrich* case, as they appear in the opinion, are these:

"It engages in no manufacturing within this state, but its local selling activities are numerous and varied. Those sales, the gross receipts from which, appellant urges, have been improperly included within the measure of its business and occupation tax, may be divided into five general classifications, as follows:

"Class A sales: These are sales by appellant's Automotive, Aviation, and Government Sales Division, which sells products to manufacturers, not for consumption, but for incorporation into articles manufactured by the purchasers, for example, fuel tanks for aircraft. This division maintains in Washington an office, a manager, and a secretary. The division manager solicits orders from Washington purchasers. These order are received and acknowledged by him, and forwarded to appellant's main office at Akron, Ohio. Final acknowledgment and approval is made at

Akron and transmitted to the Washington division office which, in turn, notifies the customer. The merchandise is shipped directly to the purchaser, f. o. b. Akron."

■ Thus, it is apparent that the general scheme of the taxpayers' operations in this state are the same. Instead of one manager within the state, the taxpayer in the instant case has a division manager and three district managers; instead of one secretary, there are four office employees; instead of one salesman (the manager), there are one hundred seventy-five of them within the state. Orders solicited are received in the Washington office and forwarded to the main office out of state. In both cases, the merchandise is shipped directly to the purchaser from out of state. In the instant case, it cannot be denied that the services rendered by the taxpayer's Seattle office are decisive factors in establishing and holding the market in this state for its publications.

Under similar circumstances, this court held that the business and occupation tax statute (the one we are considering here) did not effect an unconstitutional levy upon interstate commerce.

We do not agree with the argument that the *Goodrich* case can be distinguished, because the company had various business activities which this court treated as "an integrated whole." Just the reverse is true. The court carefully catalogued the various business activities and held some taxable under the statute and some not taxable. The fact that the taxpayer's *modus operandi* in this state parallels only one of the various business activities of the B. F. Goodrich Company, discussed in our former opinion, does not make the rules of law announced therein inapplicable.

The trial court based its decision on *Spector Motor Service v. O'Connor*, 340 U. S. 602, 95 L. Ed. 573, 71 S. Ct. 508 (1951) and *Memphis Steam Laundry Cleaners v. Stone*, 342 U. S. 389, 96 L. Ed. 436, 72 S. Ct. 424 (1952). In *B. F. Goodrich Co. v. State, supra,* this court pointed out that the *Spector* case, *supra,* was not applicable to such facts as we now have before us. The *Memphis* case, *supra,* is also distinguishable. Mississippi levied a tax of fifty dollars per

truck on a Tennessee laundry which sent its trucks into Mississippi to pick up and deliver laundry and solicit customers. Neither in fact nor in principle can the case control the one now before us.

The judgment is reversed.

ALL CONCUR.